# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| BRANDY MCGOWAN, individually and on behalf of all others similarly situated, | **Case No.** _____ |
| Plaintiff, | |
| v. | **COMPLAINT – CLASS ACTION** |
| COMMUNITY HEALTH SYSTEMS, INC., and CHSPSC, LLC, | **JURY DEMAND** |
| Defendants. | |

Plaintiff Brandy McGowan ("Plaintiff"), individually and on behalf of a class of similarly situated persons, brings this Class Action Complaint and alleges the following against Defendants Community Health Systems, Inc., and CHSPSC, LLC (collectively, "CHS" or "Defendants"), based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to them, which are based on personal knowledge.

## NATURE OF THE CASE

1.    Healthcare providers that are entrusted with handling sensitive, personally identifying information ("PII") or protected health information ("PHI") owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—and especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private health matters.

2.    The harm resulting from a data and privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their

1

lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

3.    Defendants maintain a privacy policy, which states: "We have created this Privacy Policy in order to demonstrate our firm commitment to privacy."[1] The Notice of Privacy Practices further informs patients how CHS "do[es] not sell or rent personal information about visitors to this Site. We do not use or disclose personal information obtained through this site."[2] Unfortunately, Defendants did not follow through with these and other privacy assurances, nor abide by their common law duties to safeguard this sensitive data, as evidenced by a data breach announced on or about March 6, 2023. As such, Plaintiff brings this class action on behalf of herself and all similarly situated patients whose PII and/or PHI was accessed and exposed to unauthorized third parties during a data breach of Defendants' system which reportedly occurred between January 28 and January 30, 2023. (the "Data Breach").[3] The Data Breach involved a wide variety of PII and PHI was implicated in the breach, including but not limited to, name, date of birth, Social Security Numbers, driver's license and state ID numbers, financial account and payment card information, medical information, and health insurance information.

4.    Despite CHS becoming aware of the Data Breach on February 2, 2023, Defendants inexplicably failed to promptly notify Plaintiff and the putative Class Members of the Data Breach.

---

[1] *Notice of Privacy Practices*, Community Health Services, https://www.chs.net/privacy_statement/#:~:text=We%20do%20not%20sell%20or,a. (last visited May 15, 2023).

[2] *Id.*

[3] *Notice of Data Security Event* (Mar. 8, 2023), https://apps.web.maine.gov/online/aeviewer/ME/40/e71fd844-b34a-449c-aba9-e4f63265f422/49cbc625-86d2-4e5d-b6ea-48893daefe8b/document.html (last visited May 15, 2023).

Case 3:23-cv-00520    Document 1    Filed 05/22/23    Page 2 of 49 PageID #: 2

Indeed, Defendants did not inform Plaintiff and the Class Members of the Data Breach until March of 2023, approximately two months after CHS first discovered the Data Breach.[4] Plaintiff did not receive her personal notice until April 6, 2023, approximately 3 months after CHS first discovered the Data Breach. Defendants also failed to inform Plaintiff and Class Members when or for how long the Data Breach occurred.

5.     Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

6.     To recover from Defendants for their sustained, ongoing, and future harms, Plaintiff and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring Defendants to: 1) disclose, expeditiously, the full nature of the Data Breach and the types of PII and PHI accessed, obtained, or exposed by the hackers; 2) implement improved data security practices to reasonably guard against future breaches of PII and PHI possessed by Defendants; and 3) provide, at its own expense, all impacted victims with lifetime identity theft protection services.

## PARTIES

### Plaintiff

7.     Plaintiff Brandy McGowan resides in Hattiesburg, Mississippi. In a letter dated April 6, 2023, Defendant CHSPSC, LLC disclosed to Plaintiff that her PII and/or PHI was accessible as a result of the Data Breach.

---

[4] *Id.*

**Defendants**

8.      Defendant Community Health Systems, Inc. is a Delaware corporation, with its principal place of business located at 4000 Meridian Boulevard, Franklin, Tennessee, 37067.

9.      Defendant CHSPSC, LLC ("CHSPSC") is a Delaware corporation with its principal place of business located at 4000 Meridian Boulevard, Franklin, Tennessee, 37067.

10.     CHS refers to itself as "one of the largest hospital organizations in the nation…" with 78 hospitals in 15 states.[5]

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists as CHS is a citizen of a state different from that of at least one Class Member. Plaintiff is a resident of Mississippi. Defendants are residents of the state of Tennessee by virtue of having their principal places of business located in Tennessee.

12.     This Court has personal jurisdiction over CHS because it is a resident of the State of Tennessee.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the conduct alleged herein occurred in, were directed to, and/or emanated from this District. Venue is additionally proper because CHS transacts business and may be found in this District.

## FACTUAL BACKGROUND

**A.      CHS and the Services it Provides.**

---

[5] *See CHS*, https://www.chs.net/company-overview/ (last visited May 15, 2023).

14.     CHS, for more than 30 years, has kept healthcare close to home in cities and towns across the nation. CHS affiliated hospitals deliver a wide range of health services, functioning as important members in their local communities.[6]

15.     In order to receive services from CHS, Plaintiff and Class Members are required to entrust their highly sensitive PII and PHI to Defendants. Plaintiff and Class Members entrusted this information to CHS with the reasonable expectation and mutual understanding that Defendants would comply with its obligations to keep such information confidential and secure from unauthorized access.

16.     By obtaining, collecting, and storing Plaintiff and Class Members' PII and PHI, CHS assumed legal and equitable duties and knew or should have known that Defendants were responsible for protecting Plaintiff's and Class Members PII and PHI from unauthorized disclosure.

17.     Despite CHS purporting that it "[takes a] firm commitment to privacy"[7] CHS nevertheless employed inadequate data security measures to protect and secure the PII and PHI patients entrusted to it, resulting in the Data Breach and compromise of Plaintiff's and Class Members' PII and PHI.

**B.     CHS Knew the Risks of Storing Valuable PII and PHI and the Foreseeable Harm to its Patients.**

18.     At all relevant times, Defendants knew it was storing sensitive PII and PHI and that, as a result, its systems would be an attractive target for cybercriminals.

---

[6] *Id.*
[7] *Notice of Privacy Practices*, Community Health Services, https://www.chs.net/privacy_statement/#:~:text=We%20do%20not%20sell%20or,a. (last visited May 15, 2023).

Case 3:23-cv-00520    Document 1    Filed 05/22/23    Page 5 of 49 PageID #: 5

19. Defendants also knew that a breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

20. These risks are not theoretical. The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[8] "Hospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[9]

21. Data breaches in the healthcare field are not new or unique. The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July 2022. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[10]

22. Further, a 2022 report released by IBM Security stated that for 12 consecutive years the healthcare industry has had the highest average cost of a data breach and as of 2022 healthcare data breach costs have hit a new record high.[11]

23. Indeed, cyberattacks against the healthcare industry have been common for over

---

[8] *The healthcare industry is at risk*, SwivelSecure, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited May 15, 2023).
[9] *Id.*
[10] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year (last visited May 15, 2023).
[11] *Cost of a Data Breach Report 2022*, IBM Security, https://www.ibm.com/downloads/cas/3R8N1DZJ (last visited May 15, 2023).

6

the past ten years with the Federal Bureau of Investigation ("FBI") warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[12]

24.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[13]

25.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2018, 3.1 million people reported some form of identity fraud compared to 5.1 million people in 2022.[14]

26.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendants' patients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

---

[12] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector (last visited May 15, 2023).
[13] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited May 15, 2023).
[14] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited May 15, 2023).

7

27.     PII/PHI is a valuable property right.[15] The value of PII/PHI as a commodity is measurable.[16] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[17] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[18] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

28.     As a result of their real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and becomes more valuable to thieves and more damaging to victims.

---

[15] *See* Marc Van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION & COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data (last visited May 15, 2023) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . . ").

[16] Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192 (last visited May 15, 2023).

[17] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last visited May 16, 2023).

[18] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last visited May 16, 2023).

8

29.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[19] As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[20] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[21]

30.     Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

---

[19] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited May 16, 2023) (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[20] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat. (last visited May 16, 2023).

[21] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited May 16, 2023).

9

31. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "[when] privacy information is made more salient, some consumers are willing to pay a premium to purchase from more privacy protective websites." [22]

32. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

33. Based on the value of its patients' PII and PHI to cybercriminals and cybercriminals' propensity to target healthcare providers, CHS certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

## C. Defendants Breached its Duty to Protect its Patients' PII and PHI.

34. Defendants became aware of a security incident disrupting access to its systems on the evening of January 30, 2023.[23]

35. According to CHS, it immediately began its own investigation into the potential impact of the Data Breach.[24]

36. By February 2, 2023, the investigation confirmed that data containing PII and PHI may have been accessed or acquired by an unauthorized third party.[25]

37. After the investigation revealed that PII and PHI may have been accessed or acquired by an unauthorized third party, CHS then conducted a review process to confirm what it

---

[22] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Information Systems Research 254 (June 2011), https://www.guanotronic.com/~serge/papers/weis07.pdf (last visited May 16, 2023).
[23] *Notice of Data Security Event*, *supra* note 3.
[24] *Id.*
[25] *Id.*

already knew—that PII and PHI of current and former patients had been compromised.[26] This review process took an additional two months and was completed with efforts to get notices out to impacted individuals on March 6, 2023.[27]

38.     The patient PII and PHI compromised in the Data Breach includes patient names, dates of birth, Social Security Numbers, driver's license or state ID numbers, financial account and/or payment information, medical information, and health insurance information.[28]

39.     On or about the same date that CHS reported the Data Breach to the Maine Attorney General, CHS provided notice to Plaintiff indicating that their PII and PHI may have been compromised or accessed during the Data Breach, approximately two months after CHS first discovered the Data Breach.

40.     Like Plaintiff, the Class Members received similar notices informing them that their PII and/or PHI was exposed in the Data Breach.

41.     All in all, 962,884 patients of CHS had their PII and/or PHI breached.[29]

42.     The Data Breach occurred as a direct result of Defendants' failure to implement and follow basic security procedures in order to protect its patients' PII and PHI.

43.     Upon information and belief, Defendants failed to implement one or more of the following data security measures to mitigate the risk of a ransomware attack, regardless of any variant:

> Regularly monitor and audit external facing services and assets for accidental exposure and out-of-date services. Remove any accidental exposure and patch any

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] Comm. Health Systems to Notify up to 1 Million *https://www.hipaajournal.com/community-health-systems-goanywhere-data-breach/#:~:text=In%20the%20SEC%20filing%2C%20Community,into%20the%20incident%20was%20ongoing* (last visited May 16, 2023).

11

out-of-date services, with priority on services that have known vulnerabilities. Threat Actors will frequently scan the internet for public-facing assets that have an exploitable vulnerability and gain initial access via this method.

Implement phishing training and deploy e-mail security technologies to mitigate the risk of malicious e-mail documents. Threat actor groups often conduct phishing campaigns with malicious documents in order to gain an initial foothold.

Ensure comprehensive coverage of Anti-Virus/Endpoint Detection and Response tools within your environment in order to provide as much visibility as possible into exploit/threat activity.

Maintain regular backups of all critical systems/information. Maintain offline backups as well to increase resilience.

Enforce complex passwords and Multi-Factor Authentication across all aspects of the environment (including third-party accounts).[30]

**D.    CHS is Obligated Under HIPAA to Safeguard Personal Information.**

44.    CHS is required by the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1302d, *et seq*. ("HIPAA") to safeguard patient PHI. Under HIPAA health insurance providers have an affirmative duty to keep patients' PHI private. CHS is an entity covered by under HIPAA, which sets minimum federal standards for privacy and security of PHI. As a covered entity, Defendants have a statutory duty under HIPAA to safeguard Plaintiff's and Class Members' PHI.

45.    HIPAA establishes national standards for the protection of PHI. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. This includes compliance with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E (Standards for Privacy of Individually Identifiable Health Information"), and the Security

---

[30] *Ransomware Guide, https://www.cisa.gov/stopransomware/ransomware-guide* Cybersecurity and Infrastructure Security Agency. (Last visited May 18, 2023).

Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

46.     Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

47.     Under C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

48.     HIPAA requires CHS to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 CFR § 164.102, *et. seq*.

49.     HIPAA also requires CHS to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under C.F.R. § 164.306(e), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rules." 45 C.F.R. § 164.312(a)(1).

13

50.     Further, the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[31]

51.     While HIPAA permits healthcare providers to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers to disclose PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

52.     As such, CHS is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it requires, receives, and collects, and Defendants are further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

53.     Given the application of HIPAA to CHS, and that Plaintiff and Class Members entrusted their PHI to Defendants in order to receive healthcare services, Plaintiff and Class Members reasonably expected that Defendants would safeguard their highly sensitive information and keep their PHI confidential.

**E.     FTC Guidelines Prohibit CHS from Engaging in Unfair or Deceptive Acts or Practices.**

54.     CHS is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable

---

[31] *Breach Notification Rule*, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited May 16, 2023).

14

and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

55.     The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[32]

56.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[33]

57.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

58.     CHS failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

59.     CHS was at all times fully aware of its obligations to protect the PII and PHI of patients because of its position as a healthcare provider, which gave it direct access to reams of

---

[32] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, Protecting Personal Information: A Guide for Business (ftc.gov) (last visited May 16, 2023).
[33] *Id.*

15

patient PII and PHI. Defendants were also aware of the significant repercussions that would result from its failure to do so.

**F.** **Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft.**

60. Cyberattacks and data breaches at healthcare companies like CHS are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

61. Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[34]

62. Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[35]

63. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[36]

64. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black

---

[34] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks (last visited May 16, 2023).

[35] *See* Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 HEALTH SERVICES RESEARCH 971, 971-980 (2019), https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203 (last visited May 16, 2023).

[36] *See* U.S. Gov. Accounting Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (2007), https://www.gao.gov/new.items/d07737.pdf (last visited May 16, 2023).

16

market to identity thieves who desire to extort and harass victims, and to take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

65. Theft of PII/PHI is serious. The FTC warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, open new utility accounts, and incur charges and credit in a person's name.

66. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing freezes on their credit, and correcting their credit reports.[37]

67. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research

---

[37] *See IdentityTheft.gov*, Federal Trade Commission, https://www.identitytheft.gov/Steps (last visited May 16, 2023).

shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

68.    Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

69.    Moreover, theft of PII/PHI is also gravely serious because PII/PHI is an extremely valuable property right.[38]

70.    Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care…. If the thief's health information is mixed with yours, it could affect the medial care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[39]

71.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims

---

[38] *See, e.g.*, John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[39] *See* Federal Trade Commission, *Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited May 16, 2023).

themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

72. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States. For example, with the PII/PHI stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

73. As discussed above, PII/PHI is such a valuable commodity to identity thieves, and once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

74. Social security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number:** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refund, employment—even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways. [40]

---

[40] *See, e.g.*, Susan Grant, *Consumers are in the Dark about Dark Web Monitoring Services* (March 20, 2019), https://consumerfed.org/consumers-are-in-the-dark-about-dark-web-monitoring-services/ (last visited May 16, 2023) (emphasis added).

75.     For instance, with a stolen Social Security number, which is only one subset of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[41]

76.     The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[42] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[43] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

77.     An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[44]

---

[41] See, e.g. Christine DiGangi, 5 Things an Identity Thief Can Do With Your Social Security Number (June 29, 2020) *https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/* (last visited May 16, 2023).

[42] https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 16, 2023).

[43] See, e.g. Christine DiGangi, 5 Things an Identity Thief Can Do With Your Social Security Number (June 29, 2020) https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (last visited May 16, 2023).

[44] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited May 16, 2023).

20

78.     This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against companies like CHS is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

79.     Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[45] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[46]

80.     The medical information, PHI, which was exposed is also highly valuable. PHI can sell for as much as $363 according to the Center for Internet Security.[47]

81.     These risks are both certainly impending and substantial. As the FTC has reported, hackers try to steal personal information because it is valuable. When such valuable information is breached it causes significant risk. .[48]

82.     "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy

---

[45] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web (last visited May 16, 2023).
[46] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last visited May 16, 2023).
[47] Center for Internet Security, *Data Breaches: In the Healthcare Sector*,: https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited May 16, 2023).
[48] https://consumer.ftc.gov/consumer-alerts/2019/10/what-you-can-do-fend-hackers (last visited May 17, 2023).

Forum.[49] "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[50]

83. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[51] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[52] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [53] The FTC also warns, "If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[54]

84. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

---

[49] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News, (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/ (last visited May 16, 2023).
[50] *Id.*
[51] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIVACY FORUM 6 (Dec. 12, 2017), https://www.worldprivacyforum.org/2017/12/new-report-the-geography-of-medical-identity-theft/ (last visited May 16, 2023).
[52] *What to Know About Medical Identity Theft*, Federal Trade Commission, https://consumer.ftc.gov/consumer-alerts/2019/10/what-you-can-do-fend-hackers (last visited May 17, 2023).
[53] *Id.*
[54] *Id.*

22

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[55]

85. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

---

[55] *The Geography of Medical Identity Theft*, Pam Dixon and John Emerson, World Privacy Forum, December 12, 2017, https://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf (last visited May 17, 2023).

86. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[56]

87. Cybercriminals can post stolen PII/PHI on the cyber black-market for years following a data breach, thereby making such information publicly available.

88. Approximately 16% of victims do not realize their identity has been compromised for three years after it has happened.[57] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[58]

89. Identity theft victims may spend months repairing the impact to their credit as well as protecting themselves in the future.[59]

90. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

---

[56] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 JOURNAL OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf (last visited May 16, 2023).
[57] *Id.*
[58] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages")*, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited May 16, 2023).
[59] *Expanding Services to Reach Victims*, U.S. Department of Justice,(October 2010), https://ovc.ojp.gov/sites/g/files/xyckuh226/files/pubs/ID_theft/pfv.html (last visited May 17, 2023).

91.     A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information.



92.     Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[60]

93.     As a direct and proximate result of the Data Breach, Plaintiff and Class Members have had their PII/PHI exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers,

---

[60] *Id.*

closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

94. Moreover, Plaintiff and Class Members have an interest in ensuring that their PII/PHI, which remains in the possession of CHS, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. CHS has shown itself to be wholly incapable of protecting Plaintiff's and Class Members' PII/PHI.

95. Plaintiff and Class Members also have an interest in ensuring that their personal information that was provided to CHS is removed from Defendants' unencrypted files.

96. CHS acknowledged, in its letter to Plaintiff and Class Members, that, in response to the Data Breach, CHS "is reviewing its policies and procedures to make sure employees are reminded about best practices on data security."[61]

97. Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries. For this reason, CHS knew or should have known about these dangers and strengthened its data security accordingly. CHS was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**G.    Plaintiff and Class Members Suffered Damages.**

98. CHS received Plaintiff's PII/PHI in connection with providing certain medical services to them. In requesting and maintaining Plaintiff's PII/PHI for business purposes, CHS expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of

---

[61] *See Notice of Data Security Event*, *supra* note 3.

26

Plaintiff's PII/PHI. CHS did not, however, take proper care of Plaintiff's PII/PHI, leading to its exposure to and exfiltration by cybercriminals as a direct result of Defendants' inadequate security measures.

99.     For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them. Plaintiff has taken or will be forced to take these measures in order to mitigate their potential damages as a result of the Data Breach.

100.     Once PII and PHI is exposed, there is little that can be done to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendants' conduct.

101.     Further, the value of Plaintiff and Class Members' PII and PHI has been diminished by its exposure in the Data Breach. Plaintiff and Class Members did not receive the full benefit of their bargain when paying for medical services, and instead received services that were of a diminished value to those described in their agreements with CHS for the benefit and protection of Plaintiff and Class Members and their respective PII/PHI. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they

thought they paid for (which would have included adequate data security protection) and the services they actually received.

102.    Plaintiff and Class Members would not have obtained medical services from CHS, or paid the amount they did to receive such, had they known that CHS would negligently fail to adequately protect their PII/PHI. Indeed, Plaintiff paid for medical services with the expectation that CHS would keep their PII/PHI secure and inaccessible from unauthorized parties. Plaintiff and Class Members would not have obtained services from CHS had they known that Defendants failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their PII/PHI from criminal theft and misuse.

103.    As a result of Defendants' failures, Plaintiff and Class Members are also at substantial and certainly impending increased risk of suffering identity theft and fraud or misuse of their PII and PHI.

104.    Further, because Defendants delayed in notifying Plaintiff and the Class about the Data Breach for two months, Plaintiff was unable to take affirmative steps during that time period to attempt to mitigate any harm or take prophylactic steps to protect against injury.

105.    From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[62]

106.    With respect to health care breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity

---

[62] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited May 16, 2023).

theft."[63] Indeed, in 2013 alone, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States," which is more than identity thefts involving banking, finance, the government and the military, or education.[64]

107.  "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[65]

108.  The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[66]

109.  Health information in particular is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[67]

110.  A study by Experian found that the average total cost of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[68] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while

---

[63] Jessica Davis, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HealthITSecurity (Sept. 25, 2019) https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud (last visited May 16, 2023).
[64] Michael Ollove, *supra* note 68.
[65] David, *supra* note 82.
[66] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited May 16, 2023).
[67] *Id.*
[68] Elinor Mills, *Study: Medical Identity Theft is Costly for Victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited May 16, 2023).

nearly one-third saw their insurance premiums rise, and forty percent were never able to resolve their identity theft at all.[69]

111.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[70]

112.    Plaintiff and Class Members are also at a continued risk because their information remains in Defendants' computer systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendants fail to undertake the necessary and appropriate security and training measures to protect its patients' PII and PHI.

113.    In addition, Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

## H.    Plaintiff's Experiences.

114.    Plaintiff received a data breach notice from Defendant informing her that the PII/PHI she provided to CHS had been compromised during the Data Breach. Specifically, CHS informed Plaintiff that her Social Security number and other information had been compromised during the Data Breach.

115.    As a direct and proximate result of the Data Breach, and in addition to the injuries alleged above, Plaintiff also experienced actual fraud, including fraudulent charges on her account

---

[69] *Id.*; *see also* Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (Mar. 31, 2023), www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited May 16, 2023).

[70] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, Experian (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited May 16, 2023).

without her knowledge, and Zelle payments being made that she did not do herself. Plaintiff spent many hours responding to these incidents of fraud and otherwise dealing with the effects of the Data Breach. The time spent dealing with these incidents resulting from the Data Breach is time Plaintiff otherwise would have spent on other activities, such as work and/or recreation.

116.     Plaintiff plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her accounts for any unauthorized activity.

## CLASS ALLEGATIONS

117.     Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of a Class as defined below

> All individuals whose PII and/or PHI was compromised in the CHS Data Breach, which was announced on or about March 6, 2023 (the "Class").

118.     Excluded from the Class are Defendants, its subsidiaries and affiliates, officers and directors, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

119.     This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when they move for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

120.     **Numerosity:** The Class Members are so numerous that individual joinder of all Class Members is impracticable. CHS estimates that over 960,000 patients were affected by the Data Breach. All Class Members' names and addresses are available from CHS's records, and

Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

121.  **Commonality:** This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a.  whether Defendants failed to timely notify Plaintiff and Class Members of the Data Breach;

b.  whether Defendants had a duty to protect the PII and PHI of Plaintiff and Class Members;

c.  whether Defendants were negligent in collecting and storing Plaintiff and Class Members' PII and PHI, and breached its duties thereby;

d.  whether Defendants breached its fiduciary duty to Plaintiff and the Class;

e.  whether Defendants breached its duty of confidence to Plaintiff and the Class;

f.  whether Defendants entered a contract implied in fact with Plaintiff and the Class;

g.  whether Defendants breached that contract by failing to adequately safeguard Plaintiff's and Class Members' PII and PHI;

h.  whether Defendants was unjustly enriched;

i.  whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

j.  whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct.

32

122. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class were all patients of Defendants, each having their PII and PHI exposed and/or accessed by an unauthorized third party.

123. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members. Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

124. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendants breached its duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

125. **Superiority:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum

33

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like CHS. Even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

126.   Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. At least some Class Members have already been preliminarily identified and sent notice of the Data Breach.

127.   Unless a class-wide injunction is issued, CHS may continue to maintain inadequate security with respect to the PII and PHI of Class Members, CHS may continue to refuse to provide proper and adequate notice to Class Members regarding the Data Breach, and CHS may continue to act unlawfully.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
**(On Behalf of Plaintiff and the Class)**

128.   Plaintiff restates and realleges the preceding allegations of the paragraphs above as if fully alleged herein.

129.   Plaintiff brings this claim individually and on behalf of the Class.

130.   Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding and protecting their PII and PHI in its possession, custody, and control.

131.   Defendants' duty to use reasonable care arose from several sources, including but not limited to those described below.

132.     Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendants. By collecting and storing valuable PII and PHI that is routinely targeted by criminals for unauthorized access, Defendants were obligated to act with reasonable care to protect against these foreseeable threats.

133.     Defendants' duty also arose from Defendants position as a healthcare provider. Defendants holds itself out as a trusted provider of healthcare, and thereby assumes a duty to reasonably protect its patients' information. Indeed, Defendants were in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

134.     Defendants breached the duties owed to Plaintiff and Class Members and thus were negligent. As a result of a successful attack directed towards Defendants that compromised Plaintiff's and Class Members' PII and PHI, Defendants breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) failing to adequately train

and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

135.    But for Defendants wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

136.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including, but not limited to:

a.    theft of their PII and/or PHI;

b.    costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

c.    costs associated with purchasing credit monitoring and identity theft protection services;

d.    lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    the imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

36

g.      damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.      continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.      emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

137.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

138.    Plaintiff restates and realleges the preceding allegations of the paragraphs above as if fully alleged herein.

139.    Plaintiff brings this claim individually and on behalf of the Class.

140.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as

Defendants for failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendants' duty.

141. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of a data breach involving PII and PHI of its patients.

142. Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

143. Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

144. Defendants are an entity covered under HIPAA which sets minimum federal standards for privacy and security of PHI.

145. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et. seq.*, and its implementing regulations, Defendants had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

146. Specifically, HIPAA required Defendants to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

147. Defendants violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI and by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI.

38

148. Plaintiff and the Class Members are patients within the class of persons HIPAA was intended to protect.

149. Defendants' violation of HIPAA constitutes negligence *per se*.

150. The harm that has occurred as a result of Defendants conduct is the type of harm that the FTC Act and HIPAA was intended to guard against.

151. As a direct and proximate result of Defendants' negligence, Plaintiff's and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and The Class)

152. Plaintiff restates and realleges the preceding allegations of the paragraphs above as if fully alleged herein.

153. Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI about them that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

154. As a healthcare provider, and recipient of patients' PII and PHI, Defendants have a fiduciary relationship to its patients, including Plaintiff and the Class Members.

155. Because of that fiduciary relationship, Defendants were provided with and stored private and valuable PHI and PII related to Plaintiff and the Class. Plaintiff and the Class were entitled to expect their information would remain confidential while in Defendants possession.

156. Defendants owed a fiduciary duty under common law to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and

protecting their PII and PHI in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

157. As a result of the parties' fiduciary relationship, Defendants had an obligation to maintain the confidentiality of the information within Plaintiff's and the Class Members' medical records.

158. Defendants' patients, including Plaintiff and Class Members, have a privacy interest in personal medical matters, and CHS had a fiduciary duty not to disclose medical data concerning its patients.

159. As a result of the parties' relationship, Defendants had possession and knowledge of confidential PII and PHI of Plaintiff and Class Members, information not generally known.

160. Plaintiff and Class Members did not consent to nor authorize Defendants to release or disclose their PII and PHI to unknown criminal actors.

161. Defendants breached its fiduciary duties owed to Plaintiff and Class Members by, among other things:

> a. mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI;
>
> b. mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;
>
> c. failing to design and implement information safeguards to control these risks;

d.   failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures;

e.   failing to evaluate and adjust its information security program in light of the circumstances alleged herein;

f.   failing to detect the breach at the time it began or within a reasonable time thereafter;

g.   failing to follow its own privacy policies and practices published to its patients; and

h.   failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

162.   But for Defendants' wrongful breach of its fiduciary duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

163.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including:

a.   theft of their PII and/or PHI;

b.   costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

c.   costs associated with purchasing credit monitoring and identity theft protection services;

d.   lowered credit scores resulting from credit inquiries following fraudulent activities;

41

e.    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    the imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.    damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.    continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.    emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

164.     As a direct and proximate result of Defendants' breach of its fiduciary duties, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and The Class)**

165.     Plaintiff restates and realleges the preceding allegations of the paragraphs above as if fully alleged herein.

166.     Plaintiff brings this claim individually and on behalf of the Class.

167.     Upon information and belief, Defendants funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

168.     As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

169.     Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they purchased healthcare services from Defendants and/or its agents and in so doing provided Defendants with their PII and PHI. In exchange, Plaintiff and Class Members should have received from Defendants the goods and services that were the subject of the transaction and have their PII and PHI protected with adequate data security.

170.     Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the PII and PHI of Plaintiff and Class Members for business purposes.

171. In particular, Defendants enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite security.

172. Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by its common law and statutory duties.

173. Defendants failed to secure Plaintiff's and Class Members' PII and PHI and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

174. Defendants acquired the PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

175. If Plaintiff and Class Members knew that Defendants had not reasonably secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendants.

176. Plaintiff and Class Members have no adequate remedy at law.

177. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered injuries, including, but not limited to:

    a.    theft of their PII and/or PHI;

    b.    costs associated with purchasing credit monitoring and identity theft protection services;

c.    costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

d.    lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    the imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.    damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.    continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.    emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime

opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

178. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

179. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**FIFTH CAUSE OF ACTION**
**INJUNCTIVE AND DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and The Class)**

180. Plaintiff restates and realleges the preceding allegations of the paragraphs above as if fully alleged herein.

181. Plaintiff brings this claim individually and on behalf of the Class.

182. CHS owes a duty of care to Plaintiff and Class Members requiring it to adequately secure PII and PHI.

183. CHS continues to store Plaintiff's and Class Members' PII and PHI.

184. Since the Data Breach, CHS has announced no specific changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent similar incidents from occurring in the future.

185. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches

46

that compromise their PII and PHI. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of their PII and PHI and remains at imminent risk that further compromises of their PII and/or PHI will occur in the future.

186.    Therefore, Plaintiff asks this Court to enter a judgment declaring that, among other things:

        a.    Defendants owed a legal duty to secure patients' PII and PHI under the common law, Section 5 of the FTC Act, and HIPAA; and

        b.     Defendants breached and continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII and PHI.

187.    This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect patients' PII and PHI.

188.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at CHS. The risk of another such breach is real, immediate, and substantial. If another breach at CHS occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

189.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

47

190. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at CHS, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and consumers whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all others similarly situated, pray for relief as follows:

a.　for an order certifying the Class as defined herein, and appointing Plaintiff and her counsel to represent the Class;

b.　for an order finding in favor of Plaintiff and the Class on all counts asserted herein;

c.　for damages in an amount to be determined by the trier of fact;

d.　for an order of restitution and all other forms of equitable monetary relief;

e.　declaratory and injunctive relief as described herein;

f.　awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

g.　awarding pre- and post-judgment interest on any amounts awarded; and

h.　awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded by Plaintiff on all claims so triable.

Dated: May 22, 2023                    Respectfully submitted,

**HERZFELD, SUETHOLZ, GASTEL,
LENISKI AND WALL, PLLC**

By: */s/ Benjamin A. Gastel*
Benjamin A. Gastel (BPR#28699)
The Freedom Center
223 Rosa L. Parks Avenue, Suite 300
Nashville, Tennessee 37203
Tel: (615) 800-6225
Email: ben@hsglawgroup.com

Alyson S. Beridon (BPR #40040)
Herzfeld, Suetholz, Gastel, Leniski
  & Wall, PLLC
425 Walnut St. Suite 2315
Cincinnati, OH 45202
Tel: (513) 381-2224
Email: alyson@hsglawgroup.com